UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re | ) Case No. 17-10245-B-13 |
| | ) |
| MICHAEL LLOYD LUSK and | ) |
| CAROL ANN LUSK, | ) |
| | ) |
| Debtors. | ) |
| | ) |
| | ) Adv. Proceeding No. 17-1016-B |
| SUSAN P. PETERSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MICHAEL LLOYD LUSK, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**MEMORANDUM DECISION**

<u>INTRODUCTION</u>

11 U.S.C. § 523(a)(4) excepts from discharge an individual debtor's debt for fraud or defalcation while acting in a fiduciary capacity. Debtor's former spouse here asks the court to find nondischargeable a debt stemming from a previously adjudicated community property interest in defendant's retirement benefits. The court holds that sufficient evidence has been presented establishing both the defendant's defalcation and requisite intent. Consequently, the debt representing that previously awarded community property interest is nondischargeable.

FACTS

Early Events.

The provenance of this dispute begins in August 1994 with the dissolution of a nearly 12 year marriage between joint debtor Michael Lloyd Lusk ("Michael") and his former spouse Susan P. Peterson ("Susan").[1] Michael and Susan had one son, Matthew. During their marriage, Michael worked for Allstate Insurance Company. Then, Allstate offered two retirement plans: a traditional defined benefit pension ("Allstate Pension") and a 401(k) savings plan ("Allstate 401(k)"). Michael participated in both. The California Superior Court in Ventura County issued a dissolution judgment on August 5, 1994, which incorporated a lengthy Marital Settlement Agreement ("MSA"). The MSA identified the community property of the marriage, including "pension benefits in husband's (Michael's) name arising out of his employment with Allstate Insurance Company." Specifically, the MSA provided:

> The parties agree that there is a community interest in the Husband's pension and retirement plan through his employment by Allstate Insurance Company. Wife's community interest in the plan will be calculated as follows: One Half of the product obtained by multiplying the amount of each retirement payment by the ratio of the months of Husband's employment with said employer during marriage and prior to separation over the total number of months of Husband's employment with said employer through the date of retirement. The parties further agree that the court

---

[1] Throughout this Memorandum defendant, joint debtor Michael Lloyd Lusk will be referred to as "Michael" and the plaintiff in this case, his ex-spouse, Susan P. Peterson as "Susan." The first name references are for convenience only and no disrespect is intended.

> that enters the decree of dissolution between them
> shall reserve jurisdiction to enforce the Wife's right
> to receive such payments from the Husband, or directly
> from the retirement plan.

The MSA identified the plan as "The Savings and Profit Sharing Fund of Sears Employees."

Over three years later, Susan and Matthew moved to South Carolina. This resulted in a stipulation and order to show cause signed by Susan and Michael and ordered by the superior court on August 8, 1997. The stipulation and order provided in part:

> Petitioner (Susan) releases respondent (Michael) from
> any and all claims for spousal support for maintenance
> of any kind, and acknowledges and agrees that the
> waiver of spousal support set forth in this paragraph
> is made in consideration of their mutual promises,
> conditions, and agreements contained in this
> Agreement. Further, each party acknowledges and agrees
> there shall be no reservation of jurisdiction by the
> court to award spousal support beyond December 31,
> 1997.

Less than two years later, Michael withdrew all the funds from the Allstate 401(k) without Susan's knowledge or consent and without paying any portion of the monies to Susan. Susan never received any monies from the Allstate 401(k).[2]

Interim Events.

In March 2005, Michael's 19-year employment with Allstate Insurance terminated. Michael's child support payments then either stopped or were less than required under the MSA. Matthew

---

[2] Most of the facts in this opinion are undisputed and are part of the parties' joint pretrial order in this case.

graduated from high school in late spring 2005. Michael's scheduled final payment for child support was June 11, 2005.

Susan and Michael did not communicate much following the dissolution. Susan wrote letters to Michael discussing various topics, including Matthew's progress and Michael's performance under the MSA. Sometime in the summer of 2005, Susan and Michael agreed over the phone that Susan would accept a compromised amount for the child support arrearage. Susan testified that in that conversation she said that the only remaining issue between her and Michael was division of the Allstate Pension and Allstate 401(k) benefits. Susan testified that Michael said in that conversation that the Allstate Pension and Allstate 401(k) benefits were "not available to him right now."

In 2010, Matthew graduated from the University of Houston. Susan corresponded with Michael about the events. Included with the correspondence was a note that the "retirement plan is all we have to deal with." Michael did not respond.

Withdrawals and Bankruptcy.

Michael requested that Allstate distribute the lump sum of his Allstate Pension. On September 6, 2013, he received $578,686.19. Michael did not tell Susan about the withdrawal. Susan never received any monies from the Allstate Pension.

Six months later, in March 2014, Susan began inquiring about her interest in the Allstate Pension and the Allstate 401(k).[3] Susan then retained an attorney, Darren Goodman, to assist her in discovering the status of the Allstate Pension and

---

[3] Joint Trial Exhibits (Ex. 4, 5 and 6). Plaintiff's Exhibits (Ex. 32-37).

the Allstate 401(k) and to prepare a Qualified Domestic Relations Order ("QDRO").

Mr. Goodman's efforts included issuing a subpoena to Allstate. Michael moved to quash the subpoena. A second attempt to subpoena Allstate was also met with Michael's Motion to Quash. Then, Michael realized that Susan was "not going away."[4] Michael signed a document authorizing Allstate to release information regarding the plans.

After she learned of the withdrawals, Susan hired counsel and filed a petition with the Ventura County Superior Court in August 2016, requesting orders for determination and distribution of the community property interests in the Allstate Pension and Allstate 401(k). Meanwhile, Michael had spent over $200,000.00 of the Allstate Pension monies and all of the $34,197.59 from the Allstate 401(k). Between 2014 and 2016, Michael purchased vehicles, motorcycles and a three-wheeled vehicle.

Michael had many financial demands beginning in March and April of 2005 when Michael lost a substantial salary. He also had medical expenses for his daughters after his marriage to his current wife, Carol Ann Lusk.

The Ventura County Superior Court held a trial on Susan's request for orders on October 26, 2016. The Superior Court made its findings and order after hearing on December 12, 2016. The Superior Court ruled that Susan's one-half share of the community property interest in the Allstate Pension is $119,788.00. The Court ordered that "[Michael] Lusk shall pay

---

[4] Trial testimony (Day 1, 23:18-19).

(that amount) directly to (Susan) Peterson forthwith." The superior court also ruled that Michael's withdrawal of the $34,197.59 from the Allstate 401(k) was a community property interest of his and Susan's marriage and ordered Michael to pay "forthwith to [Susan] Peterson $17,089.00 as her one-half share." The court also awarded Susan attorney's fees and costs of $10,000.00 and ordered Michael to pay that sum directly to Susan no later than December 31, 2016. Michael did not appeal the order.

Six weeks later, Michael and his current spouse, Carol Ann Lusk, filed this chapter 13 case. On May 16, 2017, the court confirmed a 60-month chapter 13 plan. Under the plan, the priority claims for unpaid taxes will be paid in full and unsecured creditors are to receive 5% on their claims. Susan filed this adversary proceeding, asking for an order determining that the $146,877.00 awarded by the Ventura County Superior Court is nondischargeable under 11 U.S.C. § 523(a)(4), on February 23, 2017. She filed an amended complaint on March 10, 2017. Susan filed a proof of claim on April 12, 2017 for the $146,877.00 awarded by the Ventura County Superior Court.

The matter was tried on March 22 and 23, 2018. Following post-trial submissions, the record is now complete.

<u>CONTENTIONS OF THE PARTIES</u>

Susan contends that under California law, Michael held the Allstate Pension and Allstate 401(k) in a trust, that Michael owed her a fiduciary duty with respect to the disposition of the Allstate Pension and the Allstate 401(k), and that the fiduciary

duty was breached when the funds were removed from those plans and put under Michael's control without Susan's knowledge or consent. Also, she claims that Michael engaged in actionable defalcation and fraud in removing and expending the funds while acting as a fiduciary and thus the debt is nondischargeable under 11 U.S.C. § 523(a)(4). Plus, Susan contends that any remaining funds from either source are held in trust by Michael and Carol Ann Lusk for Susan's benefit. So, the remaining funds should be turned over to Susan.

Michael does not dispute that he took the funds without Susan's knowledge and that he owed a fiduciary duty to Susan regarding the community property interest in the Allstate Pension and the Allstate 401(k). He also admits that his fiduciary duty to Susan was breached when he withdrew those funds and did not pay Susan her community property share of the pension plan. But, Michael contends, he did not intentionally remove the funds, because he believed that Susan had no right to any of the funds. Also, Michael contends that when the Ventura County Superior Court awarded Susan $146,977.00, that court did not identify a trust corpus and thus no express trust was created by the court order. Michael also contends that imposition of a constructive trust on any remaining funds is contrary to the chapter 13 plan and violates Carol Ann Lusk's rights. Carol Ann Lusk is not named as a defendant in this adversary proceeding.

///

///

///

DISCUSSION

**1. Applicable standards in this litigation.**

One of the major policy objectives of the bankruptcy code is to provide the "honest but unfortunate" debtor with a fresh start. *Bujna v. McArthur (In re Bujna)*, 33 F.3d 1054, 1059 (9th Cir. 1994), citing *Grogan v. Garner,* 498 U.S. 279, 286-87 (1991). Accordingly, the discharge provisions of the bankruptcy code are interpreted liberally in favor of debtors. *In re Bujna*, 33 F.3d at 1059. "Exceptions to discharge 'should be confined to those plainly expressed.'" *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) quoting *Gleason v. Thaw*, 236 U.S. 558, 562 (1915). Generally, a creditor seeking to except a debt from the debtor's discharge bears the burden of proof to establish by a preponderance of the evidence all of the elements of the statutory exception to discharge upon which the creditor relies. See *Grogan,* 498 U.S. at 287-88.

§ 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." To prevail under § 523(a)(4) for defalcation while acting in a fiduciary capacity, the plaintiff must show by a preponderance of the evidence that (1) an express trust existed; (2) the debt was caused by fraud or defalcation; and (3) the debtor acted as a fiduciary to the creditor at the time the debt was created. *Stephens v. Bigelow (In re Bigelow),* 271 B.R. 178, 186 (9th Cir. B.A.P. 2001) (citing *Otto v. Niles (In re Niles),* 106 F.3d 1456, 1459 (9th Cir. 1997), abrogated on other grounds, *Bullock v. Bank Champaign, N.A.,* 569 U.S. 267 (2013).

In this case, there is no dispute that Michael acted as a fiduciary to Susan at the time the debt in this case was created. The debt was created when the Ventura County Superior Court entered the dissolution order in August 1994 and certainly when the court issued its orders liquidating the obligation in December 2016. Those orders have not been appealed and are final. Michael disputes the existence of a trust. Michael also disputes that he had the requisite intent when he withdrew and expended the funds from the Allstate 401(k) and the Allstate Pension. First, the trust.

**2. An express trust existed over Susan's community property interest in the Allstate Pension and the Allstate 401(k) plans.**

For purposes of § 523(a)(4), a trust may be created by statute or by agreement. *In re Bigelow*, 271 B.R. at 186 *Lovelle v. Stanifer (In re Stanifer),* 236 B.R. 709, 715 (9th Cir. B.A.P. 1999). State law is relevant to determine whether there is an express or technical trust within the meaning of § 523(a)(4). *Stanifer, 236 B.R. at 714.*

State law here establishes the trust. In *In re Stanifer*, the Ninth Circuit Bankruptcy Appellate Panel examined California law and held that pursuant to California Family Code §§ 721 and 1100(e) spouses are subject to the general rules governing fiduciary relationships that control actions of persons occupying confidential relationships with each other, including the duty of highest good faith and fair dealing, and the duty not to take unfair advantage of the other. *Stanifer,* 236 B.R. at 717. California Family Code § 1100(e) specifically provides that

a spouse's fiduciary duty exists "until such time as the assets and liabilities have been divided by the parties or by a court." Here, the formula for dividing the Allstate Pension was included in the MSA adopted by the Ventura County Superior Court in 1994. But the property was undivided until the superior court issued its orders quantifying Susan's interests. The property was not divided because Michael expended all of the Allstate 401(k) benefits and most of the Allstate Pension benefits by the time court issued its order in December 2016.

The California Family Code imposes the fiduciary duty with regard to community property without regard to any act of wrong doing. See *Stanifer,* 239 B.R. at 709 and California Family Code § 2102. So under *Stanifer* and the controlling California statues, a trust does exist by virtue of Michael's and Susan's marital relationship without regard to Michael's wrongdoing. The superior court's December 2016 order did not change that. Therefore, a requisite trust exists under California law and under the narrow scope of fiduciary relationships that qualify under § 523(a)(4). Next, the question of Michael's defalcation and culpable state of mind.

## 3. The plaintiff has proven Michael's defalcation and culpable state of mind.

Defalcation is a misappropriation of trust funds or money held in any fiduciary capacity.[5] *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1186 (9th Cir. 1996). Defalcation also includes the failure by a fiduciary to account for money or property that has

---

[5] "Misappropriation" is "the application of another's property or money dishonestly to one's own use." Black's Law Dictionary (10th ed. 2014).

been entrusted to him. *Pemstein v. Pemstein (In re Pemstein)*, 492 B.R. 274, 282 (9th Cir. B.A.P. 2013). Once a creditor has shown that the debtor is a fiduciary to whom funds have been entrusted, the burden shifts to the fiduciary to account fully for all funds received. *In re Niles*, 106 F.3d at 1462.

Here, Michael was Susan's fiduciary with respect to the community property of the marriage until it was divided. It is undisputed that funds from both the Allstate Pension and the Allstate 401(k) were taken by Michael and deposited in his personal accounts without Susan's knowledge or consent. When asked by Susan's counsel at trial, Michael repeatedly did not recall how the monies deposited in those accounts was spent; he could not account for the money or property he held and under *Niles*, it was his burden to account fully for all funds received. Michael did not meet that burden, and thus did commit a defalcation under § 523(a)(4).

But, finding that a defalcation was committed is insufficient to make a debt nondischargeable. The creditor must also establish a "culpable state of mind ... involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock*, 569 U.S. at 269. The conduct must involve bad faith, moral turpitude, other immoral conduct, or an intentional wrong (meaning conduct the fiduciary knows is improper or if the fiduciary "consciously disregards" or is willfully blind to a "substantial and unjustifiable risk" that his conduct will violate the fiduciary duty). *Id.* at 273-74. Put another way, a bankruptcy court needs to find that the debt resulted from (i) acts of bad faith, moral turpitude, or

other immoral conduct; (ii) intentional improper conduct or criminally reckless conduct; or (iii) conscious disregard or willful blindness to a substantial and unjustifiable risk. *Heers v. Parsons (In re Heers)*, 529 B.R. 734, 742-43 (9th Cir. B.A.P. 2015).

The court observed the demeanor of Michael and Susan during the trial. Both gave responsive answers to the questions presented. Both appeared to be intelligent and thoughtful. Both have professional or semi-professional backgrounds: Michael as an insurance agent and Susan in the medical field. Michael's demeanor on the stand supported that he is someone who has succeeded in a contractually based field (insurance). His general demeanor as a witness establishes for the court that he was aware of the risks involved in his acquisition and expenditure of the Allstate Pension and Allstate 401(k) funds. While some of the facts about Michael's "state of mind" relating to the defalcation are disputed based on the evidence and testimony, there are four reasons supporting a finding that Michael had a culpable state of mind.

First, Michael was represented by counsel when the original MSA became part of the dissolution judgment. The MSA confirms the community interest in Michael's pension and retirement plan and provided a calculation for the extent of Susan's interest. Both Michael and Susan signed the MSA and it became part of the Ventura County Superior Court's order in 1994. The document directly contradicts Michael's testimony that it was both his and Susan's intent that they each would "keep [their] respective retirement plans."

Susan testified she understood that under the MSA she needed to wait until Michael reached retirement age before she could enforce her community property rights. That was probably incorrect. That said, it does not change Michael's legal status as a fiduciary. Further, there was no evidence presented that Michael relied upon Susan's misunderstanding or made any effort, as a fiduciary, to correct her error.

Second, Michael's contention that the 1997 order changed his obligation to Susan concerning the Allstate retirement benefits is inconsistent with the order's provisions or the party's actions. The 1997 order did release Michael from "any and all claims for spousal support or maintenance of any kind." The 1997 order also provides that each party acknowledge and agreed there would be no reservation of jurisdiction by the court to award spousal support beyond December 31, 1997. The superior court orders are final and conclusively determined the rights of the parties as of the dates they were entered. Michael contends his subjective understanding is contrary to the terms of the orders. Unfortunately, that understanding is irrelevant.

Marital settlement agreements incorporated into a dissolution judgment are construed under the statutory rules governing the interpretation of contracts generally. *In re Diener*, 483 B.R. 196, 206 (9th Cir. B.A.P. 2012) (citations omitted). Under California contract law, the court must interpret the contract to give effect to the parties' mutual intent at the time they made the contract. California Civil Code § 1636; *TRB Investments, Inc. v. Fireman's Fund Insurance Company,* 40 Cal. 4th 19 (2006) ["the 'clear and explicit'

meaning of provisions [in a contract] interpreted in their 'ordinary and popular sense,' in the absence of evidence to the contrary, controls judicial interpretation"]; California Civil Code §§ 1638, 1644; *AIU Insurance Company v. Superior Court of Santa Clara County,* 51 Cal. 3rd 807 (1990). A court may look to general dictionary definitions to aid its analysis of a term's meaning. *Scott v. Continental Insurance Company*, 44 Cal. App. 4th 24 (1996).[6]

The 1997 order only modifies maintenance and support and does not deal with property division. As used in that order, "maintenance" means "financial support given by one person to another, usually paid as a result of legal separation or divorce; especially, alimony."[7] "Maintenance" has also been defined as "the act of providing means of support for someone."[8] In its conventional and ordinary sense, "maintenance" means the same thing as "support." The concepts of "support" and property division are distinct in the original MSA. That was not changed by the 1997 order. Michael's claim that the 1997 order waived Susan's property rights is inconsistent with the plain and ordinary meaning of the terms of the order.

Third, Susan's unchallenged testimony about her conversations with Michael on the subject establish a known risk. The division of the retirement benefits was a subject of the original MSA. Shortly after Matthew graduated high school in

---

[6] <u>Black's Law Dictionary</u> qualifies as a general dictionary for purposes of contract interpretation. See, *Flintkote Company v. General Accident Assurance Company of Canada,* 410 F.Supp.2d 875, 887-88 (N.D. Cal. 2006)(citing *Cooper Companies v. Transcon Insurance Company,* 31 Cal. App. 4th 1094 (1995).

[7] <u>Black's Law Dictionary</u> (10th ed., 2014).

[8] <u>Webster's Third New International Dictionary</u> (2002).

2005, Michael and Susan discussed the retirement and savings plan over the phone. Michael responded "that (the pension benefits) was not available to him right now." Michael did not recall the telephone call. Michael and Susan testified that there were infrequent communications between them. Given the infrequency of the communications, and the size of the retirement benefits eventually paid to Michael, it is not credible that Michael was unaware that Susan was claiming an interest in the retirement benefits. In fact, Michael testified that he subjectively knew Susan was not going to "go away."

When Michael was eligible for the pension benefit (the 401(k) benefit had then been expended) in 2013, he received a cash payment from Allstate. He did not tell Susan that he received the funds. Susan hired counsel to investigate the matter and prepare a QDRO. Michael moved to quash two subpoenas Susan's counsel had issued seeking information from Allstate. So, not only did Michael keep the distribution a secret from Susan but also affirmatively tried to stop further inquiry. Even after Michael knew Susan was not going to "go away" he expended substantial funds from his and his current wife's accounts in 2013-2015.

Michael testified that he had needs for funds, including operating his business, caring for his daughters, and purchasing vehicles. All of those needs are understandable. That said, the superior court established that Michael had other obligations as well, stemming from his marriage to Susan. Even if one assumes Michael reasonably believed he had no further obligation to Susan following the 1997 order, as recently as 2005, Michael

knew the risk of proceeding under that assumption when Susan continued to communicate her expectation of receiving a portion of the Allstate Retirement Benefits. Michael knew of the risk and proceeded to act facing that risk.

Fourth, the 2016 Ventura County Superior Court order liquidating Michael's obligation establishes the requisite intent. When Susan learned that the retirement proceeds were distributed to Michael, she petitioned the superior court for orders determining her community property interests in the retirement plans. Michael and Susan were represented by counsel at the hearing on October 26, 2016. The court's order after hearing entered December 12, 2016 awarded Susan $119,788.00 representing Susan's one-half share of the community property interests in the Allstate Pension and $17,089.00 representing one-half of the Allstate 401(k) funds that Michael withdrew in 1999. The court also granted Susan's request for attorney's fees and awarded $10,000. The issues which Michael raises here in defense of Susan's claim may have been and certainly could have been raised at the October 2016 hearing. The superior court relied upon the provisions of the MSA. It is also undisputed in this case that Michael had not paid Susan any of the funds from the Allstate Pension or Allstate 401(k). Michael's arguments are not persuasive. To further support that conclusion, there is uncontroverted evidence that during 2016, even after Susan had petitioned the superior court, withdrawals were made from accounts while the issues were pending before the Superior Court.

The foregoing reasons all support the court's finding that in addition to committing a defalcation, Michael had the requisite culpable state of mind making the Ventura County Superior Court's award on December 12, 2016 in the amount of $146,877.00 nondischargeable under 11 U.S.C. § 523(a)(4).

Next, the court will briefly discuss remedies.

**4.  The court does not find that the imposition of a constructive trust is appropriate.**

Throughout this litigation, Susan has changed the focus of the remedy she seeks. The first amended complaint simply prays for an order determining that the sum of $146,877.00 is nondischargeable. The joint pretrial order states that Susan is seeking an order determining that Micael holds $146,877.00 in trust for Susan and compelling him to turn the monies over to her. Yet, Susan's post-trial submission does not stress the issue and offhandedly states that since Michael held the funds in express trust for Susan, turnover of the remaining funds is appropriate. The court is not convinced.

The bankruptcy court must act very cautiously in exercising the remedy of constructive trust, "a remedy of relatively undefined equitable power" to override the bankruptcy priority scheme. *In re North American Coin & Currency*, 767 F.2d 1573, 1575 (9th Cir. 1985) cert. den. sub nom *Torres v. Eastlick*, 475 U.S. 1083 (1986). This proscription is to be observed notwithstanding whatever presumption California law may have since it cannot conflict with Federal bankruptcy law. *Toys "R" Us, Inc. v. Estrow Inc. (In re Estrow Inc.)*, 645 F.2d 794, 797-

98 (9th Cir. 1988). There is, accordingly, a "strict tracing" requirement before a constructive trust can be imposed. Under the standard applicable to bankruptcy cases involving comingled funds, the plaintiff has the burden of tracing the trust property "specifically and directly" back to the illegal transfers giving rise to the [constructive] trust. *Taylor Associates v. Diamant (In re Advent Management Corp.)*, 104 F.3d 293, 296 (9th Cir. 1997). "Such a tracing requirement is necessary to further the bankruptcy policy of equitable distribution among similarly situated creditors." *In re Bullion Reserve of North America*, 836 F.2d 1214, 1218 (9th Cir. 1988).

Here, the plaintiff has established through Michael's testimony that funds from the Allstate Pension were deposited in personal accounts and that withdrawals were made from those accounts. However, plaintiff has not strictly traced those funds to specific assets. Rather, the plaintiff seems to be asking the court to presume that each withdrawal from Michael and his current spouse's accounts necessarily involved simply Allstate Pension funds. The evidence does not support that assumption. Also, since the court must be circumspect in imposing a remedy that would be contrary to priority scheme under the bankruptcy code, far more evidence of direct tracing would be needed.

On balance, the court is not convinced Susan has met her burden on strict tracing and the court declines to impose a constructive trust. The court is also mindful of the fact that Michael's current spouse is not a defendant in these proceedings and that the imposition of a constructive trust would have the

effect of circumventing a chapter 13 plan which has already been confirmed by the court.[9]

**5. Attorney's fees will not be awarded for this proceeding at this time.**

The debt this court adjudges as nondischargeable includes $10,000.00 of attorney's fees awarded by the Ventura County Superior Court.

In *Cohen v. De La Cruz*, 523 U.S. 213 (1998), the Supreme Court rejected Michael's contention here that Susan's attorney's fees awarded by the Superior Court are dischargeable since they were not part of the alleged defalcation. Analyzing the extent of a non-dischargeable fraud claim under § 523(a)(2), the Court specifically rejected the "restitutionary ceiling" on recovery urged by Michael here. *Id.* at 219-21. The court in *Cohen* affirmed the lower court's holding which included attorney's fees (and treble damages) previously awarded plaintiff by the state court even though those amounts "exceed the value obtained by the debtor" from the fraud. The court held:

> Once it is established that specific money or property has been obtained by fraud, however, "any debt arising therefrom is excepted from discharge." *Id.* at 218 ... any liability traceable therefrom plus attorney's fees and costs falls within that exception [from discharge]. *Id.* at 219.

---

[9] Since the court has declined to impose a constructive trust, the court will not consider the "unclean hands" defense raised by Michael in this proceeding. The defense is based on the disputed fact that Susan had undisclosed retirement benefits when the marriage dissolved. Even if relevant, the court is not persuaded that Michael met his burden of proof on the defense.

The Court examined the definition of "debt" and "claim" under the Bankruptcy Code, §§ 101(12) and (7) respectively, and further defined "claim" as an enforceable right to payment. *Pennsylvania Department of Public Welfare v. Davenport*, 495 U.S. 552, 559 (1980). Finding the treble damages and attorney's fees enforceable rights of payment, the Court included that relief in the exception to discharge. *Id.* at 223. The attorney's fee for "establishing the fraud" were included. *Id.*

This same analysis has been applied to claims that a debt is nondischargeable under § 523(a)(4). See, *In re Palombo,* 456 B.R. 48, 64 (Bankr. C.D. Cal. 2011) [Misaccounting for ERISA plan funds by a plan trustee]; *Indo-Med Commodities Inc. v. Wisell (In re Wisell),* 494 B.R. 23, 43 (Bankr. E.D. N.Y. 2011); *Barrett v. Barrett (In re Barrett),* 410 B.R. 113 (Bankr. S.D. Fla. 2009). Here, the Ventura County Superior Court was clear in awarding $10,000.00 for Susan's attorney's fees. The court awarded the fees as "attorney's fees and costs that were incurred to enforce the provisions of the judgment in the sum requested of $10,000.00, as reasonable fees and costs incurred." The Superior Court has determined the $10,000.00 is stemming from the defalcation.

To be sure, the fees that may be an element of Susan's damages stemming from the defalcation differ from the fees she incurred in pursuing this litigation. Susan claims that the provisions of the MSA support an award of attorney's fees if Susan is the prevailing party in this case. Susan relies on California Code of Civil Procedure § 1021. In support of her

interpretation, Susan cites *3250 Wilshire Boulevard Building v. W.R. Grace & Co.*, 990 F.2d 487, 489 (9th Cir. 1993).

   *Wilshire* does not support Susan's interpretation. In *Wilshire* the Ninth Circuit looked to the provisions of the contract itself and found that the broad provisions in the contract between the parties encompassed the claims in that case. The importance of the contract provision itself in an analysis under California Code of Civil Procedure § 1021 cannot be ignored. See, *Mitsui O.S.K. Lines Limited v. Seamaster Logistics, Inc.*, 618 Fed. App. 304, 307 (9th Cir. 2015) [contract provision did not support extension of California Code of Civil Procedure §1021]; *Taburaza v. Zarate (In re Zarate),* 567 B.R. 176 (Bankr. N.D. Cal. 2017) [same]. The court is not ruling that attorney's fees are not recoverable for pursuit of this litigation. However, it is premature for the court to rule on the issue without significant analysis and briefing by the parties on whether the provisions of the MSA support an attorney's fees award. Fortunately, Federal Rule of Civil Procedure 54 (incorporated in part by Federal Rule of Bankruptcy Procedure 7054) provides a procedure for the attorney's fees issue to be litigated.

   The court declines without prejudice to award attorney's fees to Susan at this time.


                               CONCLUSION

   For the foregoing reasons, judgment shall be entered in favor of Susan P. Peterson and against Michael Lloyd Lusk that the sum of $146,877.00 awarded by the Ventura County Superior

Court is nondischargeable under 11 U.S.C. § 523(a)(4).
Attorney's fees are not awarded at this time. Counsel for the
plaintiff shall prepare a judgment in conformance with this
ruling within 14 days from the date of this Memorandum Decision.
Any requests for attorney's fees shall be governed by Federal
Rule of Bankruptcy Procedure 7054.

**Dated:** Jul 05, 2018

**By the Court**

**René Lastreto II, Judge**
**United States Bankruptcy Court**

**Instructions to Clerk of Court**
**Service List - Not Part of Order/Judgment**

The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below. The Clerk of Court will send the Order via the BNC or, if checked __X__, via the U.S. mail.

Debtor(s), Attorney for the Debtor(s), Bankruptcy Trustee (if appointed in the case), and __X__ Other Persons Specified Below:

Hagop T. Bedoyan
5260 N. Palm Avenue, Suite 205
Fresno CA 93704

Peter B. Bunting
2304 W Shaw Ave, Suite 103
Fresno CA 93711

Michael H. Meyer
PO Box 28950
Fresno CA 93729-8950

Office of the U.S. Trustee
United States Courthouse
2500 Tulare Street, Room 1401
Fresno CA 93721